GUSTAVO CASANOVA, Plaintiff and Appellee, v. GONZÁLEZ PADÍN Co. INC., Defendant and Appellant.

No. 6247. Argued April 6, 1934.—September 29, 1934.

462

*C. Iriarte* for appellant.  *Diego O. Marrero* and *E. Font Suárez* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the Court.

This is an action for damages for libel and slander and false arrest. Judgment was rendered in favor of plaintiff and the court declared the following facts proved:

"Ligia Laforet Carbonell and Gustavo Casanova were husband and wife and lived with their children at their home in Santurce, Isern Street No. 33. On October 11, 1930, about 2 o'clock P. M., Mrs. Casanova arrived at the establishment of defendant González Padín Co. Inc. in order to buy certain articles for her personal use. She went to the place where ladies' underwear was sold and bought three brassieres, for which she paid one dollar for each, upon receiving the corresponding ticket—in total $3.00. She also bought a bras-

siere of less price, valued at 50 c, for which she paid and received for her purchase the corresponding ticket.

"Upon returning to the same department, from that where suits for boys were sold, to which she had gone with the intention of buying something for her children, in order to examine the last brassiere bought to see if it was the desired size, one of the sales-girls of defendant corporation told her the following words: 'Young lady, please put there the brassiere you have taken without paying for it.' When she answered these words, another of the ladies employed with defendant company intervened, making more specific the imputation by the use of the word 'larceny' addressed to the wife of plaintiff, who, upon hearing this last statement answered that she had not stolen anything, for she had paid for all the articles she had in her purse. One of said employees of defendant then requested delivery of her purse and threatened to call the directors of the company if she failed to do so. To this, Mrs. Casanova answered that she would not deliver her purse to any one but her husband.

"At this time Mr. Emilio J. Noya intervened. He was a member of the Board of Directors of defendant company and inspector, among other duties, of the commercial movement in the different departments of said company. He approached the place where the dispute was taking place, accompanied by a policeman, Emiliano Fernández, who was brought to the store by said Noya, by order of Mr. Manuel Alvarez, also a director of defendant company and General Manager of the same, to intervene in the matter and to render any necessary service. Mr. Noya asked the employee who started the dispute, if the said lady had paid the price of the article purchased, and the employees answered in the negative. The original imputation of larceny against the wife of plaintiff was once more ratified by a third employee of this defendant. (Testimony of Miss Vad.) At this moment Mr. Alvarez invited Mrs. Casanova to go to another place with him, and then using the elevator of the store said lady together with Mr. Alvarez and other persons went to the floor occupied by the furniture department. There the officers of defendant again requested her to turn over to them the purse where she had the stolen object, and told her that if she failed to do so she would be arrested, and she again refused and asked them to please call her husband to whom she would deliver the purse, and informed them the address where they could call him.

"The demand continued to be insistently made, even by policeman Fernández. Every time it was made Mrs. Casanova denied the imputation of larceny and requested that her husband be called to whom she would turn over the purse and she stated that she was an honest woman, of a good family, and that she was not going to dishonor her husband and her children. The agents of defendant always answered that all persons in similar circumstances said the same thing, and then Mr. Alvarez ordered Mr. Noya to accompany the policeman and Mrs. Casanova to police headquarters. When insular policeman Fernández who was acting there, informed the said Mrs. Casanova that he would take her to headquarters, she again insisted that she was innocent and that they should call her husband, and once more her petition was refused. She was then taken in the elevator to the lower part of the building and conducted under arrest by the policeman and by Mr. Noya who was obeying orders of Mr. Alvarez, by the streets of the city from defendant's store to police headquarters.

"From the moment the dispute arose, in the department of ladies underwear in the store of defendant, until the time when they left the building to go to headquarters, numerous persons gathered who witnessed the dispute and who learned of the imputation made against plaintiff's wife, and more persons gathered whilst walking in the streets and followed her and the persons taking her to headquarters, curious to learn what happened.

"At police headquarters plaintiff's wife was again requested to hand over her purse, both by officers of the police force as by employees of defendant and by other persons who tried to convince her to do so, plaintiff's wife always refusing to deliver it to anyone but her husband, who she desired should be called so as to put an end to the arrest to which she had been subjected. Later, after about two hours of being under arrest at police headquarters in San Juan, where she was taken under arrest by policeman Emilio Fernández, plaintiff Casanova arrived at headquarters and his wife delivered her purse to him. Said lady had been under the continuous observation of the employees of defendant from the moment the dispute arose to this moment. Then, in the presence of her husband, of Mr. Angel Umpierre, Municipal Judge of Toa Alta, at that time acting in San Juan, of the police captain and of numerous attorneys and police officers, her pocket book was opened which contained, three brassieres of the sames quality and a brassiere of an inferior quality and also two sale tickets issued by defendant corpo-

ration on the same 11th day of October, evidencing a cash payment of three dollars for three brassieres at one dollar each, corresponding to the ladies underwear department and another ticket issued by defendant corporation on the same 11th day of October, evidencing a cash payment of 50 cents for a brassiere issued by the same department, where Mrs. Casanova had purchased and paid for said articles.

"Thereafter, Mr. Umpierre, the Municipal Judge, made and put in writing an investigation of the facts and reached the conclusion that no crime had been committed by plaintiff's wife, who near nightfall was released to go home, after the immense anguish and great shame occasioned her by the guilty and completely unjustified action which was initiated and maintained by the employees and agents of defendant corporation in the course of their employment in the manner stated.

"In order to destroy the effect of said facts established by plaintiff, defendant corporation, by the purely negative terms of its answer, tried to prove that they occurred in a different manner. To that end it tried to establish that Miss. Vad when the dispute arose tried only to obtain the brassiere purchased in order to wrap it; that she admitted that in fact she had taken the article without paying for it and that if she was taken to police headquarters it was at her own request.

"A careful examination of the evidence offered to prove said facts, however, inevitably shows that they were not duly established, and, that, on the contrary, the evidence offered to sustain them was contrary to this contention."

The judge continued with the examination of defendant's evidence and states:

"These and other considerations of strict analysis, together with the personal impression obtained from all the evidence in the case, caused the court to declare that the facts in its opinion, did not occur as claimed by the defendant corporation, and to declare proved, on the contrary, that due to a deplorable error committed by the agents and officers of the defendant in the course of their employment, Mrs. Ligia Laforet Casanova was subject to the public imputation of larceny made by them against her, without having the certainty of said imputation, by virtue of which and at their instance said lady was improperly and illegally arrested and deprived of her liberty on the afternoon of October 11, 1930."

Defendant was not satisfied with the judgment rendered against it and appealed to this Court, assigning in its brief the commission of three errors as follows:

"1.—The court erred in concluding that the preponderance of the evidence was in plaintiff's favor.

"2.—The court erred in deciding that the law is in favor of plaintiff and against defendant.

"3.—The court erred in granting to plaintiff an idemnity of $10,000 which is excessive and out of proportion with the general damages alleged in the complaint."

In our judgment, the first assigned error was not committed. We have carefully examined all the evidence introduced, and taken into consideration all the arguments contained in the brief of appellant attacking the findings of fact which we have transcribed, and at the end of our examination we have concluded once and again that the attacked findings are sustained by the evidence and that it can not be maintained that the lower court in deciding the conflict in the evidence was moved by bias, prejudice or passion or that it committed manifest error.

It is true that we have hesitated while analyzing the testimony of the witness for plaintiff Vicente N. Quiñones and in trying to explain his taking part in this suit, but in reading again and weighing the testimony of the aggrieved party the same has appeared to us to be so reasonable, firm and sincere that we can easily explain the decision of the trial judge in giving it credit. The facts speak for themselves and the very evidence of defendant analyzed in detail and in its entirety also justifies the decision appealed from.

We can not admit that if plaintiff's wife confessed before employees and officers of defendant and ratified before the very policeman who arrested her that she had committed the crime with which she was charged, and that if Noya, a director of defendant, went to headquarters with the sole purpose of taking charge of the stolen brassieres, the investigation made was immediately terminated for lack of a basis,

the wife was released, and the Director returned to his store without the brassieres and took no further steps.

It was due to the fact that when the purse was opened, the falseness of the charge was clearly established.

Nor is it possible to harmonize the alleged existence of a plot expressly prepared to create this cause of action with the confession of guilt by the person who necessarily had to base her cause of action on her innocence.

The explanation of the happenings perhaps may be found in the fact revealed by certain words which María Luisa Mercado, a witness for plaintiff, heard expressed by Noya whilst he was going with policeman Fernández and plaintiff's wife to police headquarters. The witness testified:

". . . . they went by San Francisco street and I followed them and heard that several persons inquired from Mr. Noya what had happened and he said:

" 'The usual thing, larceny.' "

"The usual thing," the fact that many thefts had been committed at defendant's store, perhaps caused her to act too promptly, without respect to human personality, and without pity for a woman, making the imputation without ascertaining its absolute truth and causing the arrest by the policeman which occasioned to plaintiff's wife the shame, pain and physical and moral sufferings which appear from the evidence and from the very condition of human nature.

If the employees of defendant first and its directors later, instead of making the imputation of the commission of a crime had tried to verify their suspicions without offending her, consenting at least to her insistent request that her husband be called, perhaps everything would have been avoided. Prejudice prevailed and caused the employees and directors to act in the manner stated.

■■ The second error assigned deals with the following three propositions:

"Publication is an essential element of slander, and it was not established in this case.

"Corporations are not responsible for the acts of its agents or employees, unless executed in the course of their employment and in the real and effective performance of their duties, or if said acts are expressly authorized or ratified.

"Malice and lack of reasonable cause are essential elements in this case."

The element of publication exists. The imputation was made in public in the store of defendant in one of its sale departments, was repeated 'at the place where plaintiff's wife was taken, and reiterated in the street. The imputation was not only public but also notorious.

Miss Vad, the salesgirl, as well as Mrs. Blanco, in charge of the department, and the directors Noya and Alvarez, the former cashier, director and floor walker of defendant and the latter director and general manager of the same acted within the scope of their employment and the sphere of their powers, and hence defendant is bound.

"This court has often, in cases of this class, as well as in other cases", said the Supreme Court of the United States in the case of *Lake Shore & Michigan Southern R. R. Co.,* v. *Prentice,* 147 U. S. 101, 109, "affirmed the doctrine that for acts done by the agents of a corporation, in the course of its business and of their employment, the corporation is responsible, in the same manner and to the same extent, as an individual is responsible under similar circumstances."

■ Malice is presumed in cases of this class where the imputation of the commission of a crime is made to a stranger.

Section 5 of the "Act to Authorize Actions for Damages Caused by Libel and Slander," approved in the year 1902 and found at page 308 of the Code of Civil Procedure, Ed. of 1933, reads:

"Section 5.—Malice shall be presumed to exist in any injurious communication or writing made without justifiable motive and addressed to any person other than to a relative within the third degree, or to a person whom the author has under his guardianship, or when said communication passes between persons having business in partnership or other similar association."

And the jurisprudence states:

"As a general rule to charge one orally with the crime of larceny is actionable *per se.*" 36 C. J. 1204.

"It is universally held that in actions for defamation, when the words uttered are actionable *per se* malice is conclusively presumed." 17 R. C. L. 322.

"It is a general rule that where in a defamatory publication words are used which are libellous *per se,* a presumption of malice on the part of the author of the communication will exist and, in such a case, damages will be presumed to have been caused;" *Jiménez* v. *Díaz Caneja,* 14 P.R.R. 9.

"The publication of defamatory matter actionable *per se* entitles the party defamed to compensation for the actual injury done him without regard to the motive with which the publication was made; want of actual intent to injure furnishes no legal excuse. The intent is immaterial, at least in the absence of any claim to exemplary damages. It has been held that the intent is conclusively presumed.

"The decisions have both affirmed and denied that malice is a necessary ingredient, or the gist, of an action for defamation. The different views do not in fact create divergence in the substantive law of defamation, as their ultimate effect is identical. The term 'malice,' in the law of defamation, may be used to denote merely the absence of lawful excuse, that is, implied malice or malice in law, or it may be used as a term involving some intent of the mind and the heart, ill will against a person, that is, actual malice or malice in fact. But ordinarily, where plaintiff seeks the recovery of general damages only, it is only legal or implied malice that is referred to, and not malice importing hatred or ill will, and, by fiction of law, such malice is implied or presumed to exist from the unprivileged publication of defamatory words actionable *per se,* and no actual or express malice need be established in order to entitle the injured party to recover the actual damages he has sustained from the unprivileged publication of a charge or imputation defamatory *per se,* unless otherwise provided by statute. The absence of actual or express malice is no defense." 36 C. J. 1214–5.

■ There was an arrest. The policeman intervened at the request of defendant. The latter, through one of its directors, threatened the wife of plaintiff with arrest if she did not deliver the purse and in effect the lady was taken to

police headquarters accompanied by another of the directors of defendant, and remained at headquarters deprived of her liberty until the municipal judge investigated the case and acknowledged her innocence.

Section 241 of the Penal Code provides:

"False imprisonment is the unlawful restraint of a person's liberty whether in a place made use of for imprisonment generally, or in one used only on the particular occasion, or by words and an array of force, without bolts or bars in any locality whatever."

And the jurisprudence says:

"False imprisonment consists in the unlawful restraint against his will of an individual's personal liberty or freedom of locomotion. The gist of false impriosnment is unlawful detention." 25 C. J. 443.

In the case of *Strain v. Irwin*, 70 So. 734, 736, it is said:

"An illegal arrest is both technically and in fact a false imprisonment, and the additional allegation of an *imprisonment* is not essential to the statement of a cause of action under Code, form 19, p. 1198. Nor is the prescribed allegation of the duration of the imprisonment other than directory, since it relates merely to the extent of the injury; and a *momentary* detention, if wrongful, gives a complete cause of action. 19 Cyc. 325."

In the case of *Maliniemi v. Gronlund*, 52 N.W. 627, 628, the Supreme Court of Michigan states:

"There was no malice in Gronlund's action, and the court so informed the jury; but for the arrest, and the consequent damage to plaintiff, defendant was plainly responsible, under the plaintiff's showing and the authorities. If it had not been for defendant, plaintiff would never have been arrested or imprisoned. The whole period of plaintiff's imprisonment was the natural result of defendant's acts. According to plaintiff's statement, defendant did more than to simply communicate facts and circumstances of suspicion to the officer, leaving such officer to act on his own judgment. The officer, who is not sworn in the case, evidently acted upon the judgment of Gronlund, and it may well be said that defendant directed the arrest. A private person has a right to arrest a man on suspicion of felony without a warrant; but if he does so, and it turns out

that the wrong man is imprisoned, he must be prepared to show in justification—First, that a felony has been committed; and, *second,* that the circumstances under which he acted were such that any reasonable person, acting without passion or prejudice, would have fairly suspected that the plaintiff committed it, or was implicated in it, 2 Add. Torts, Section 803, and cases cited.''

In the instant case action was taken based on a mere suspicion without justifiable cause. The fact that after the purchase plaintiff's wife returned to the department where she had made said purchase to ascertain whether the size of the last brassiere she had bought was correct and to that effect opened her purse to examine it, does not justify the action of defendant's employees and the subsequent acts of its directors. Nor was plaintiff's wife under obligation to open her purse in the manner ordered by defendant. She might have done so and the case surely would not have developed as it did, but the fact that she did not do so does not justify the conduct of defendant. Her request that her husband be called was reasonable and by so doing defendant could have avoided the case, but failed to do so.

It seems convenient to transcribe here the following part of the testimony of the wife. She says:

''Pointing to Mr. Alvarez. Then that gentleman, in very good words told me: 'Young lady, will you come to the office with me?', and as he was the only one who did not offend me, I thought he was going to help me there and I followed him, but I did not know the place, I know that they took me in the elevator and as he had said that he would take me to an office, I got in the elevator, but they did not take me to an office. When I got off the elevator I found myself in a place where there was only furniture and a man cleaning. When I realized I was there, I received a terrible impression and I thought of many things.

''Then this stout gentleman took me by the arm and said: 'Young lady, give me your purse or I will arrest you.'' I told him I could not deliver the purse, to please call my husband, that when my husband arrived I would deliver the purse; I begged him to call my husband and gave him the address and the gentleman answered me that neither husband nor family mattered, that what he wanted

was the purse and the stolen objects. And I told him: 'I have not stolen, believe me, I do not give you the purse because my husband must come here where we are alone.'

"I could stand no more; one took me there, the other said 'Hand it over,' the policeman also, 'hand the purse, and if you have done something wrong, I will not arrest you.' I only wished for my husband to arrive. And I told them. 'I am a lady of a good family, honest, and I have never done anything wrong, and I am not going to dishonor my husband and children' and then this gentleman said that all of us who went there said the same thing and I told him that I had not stolen and that I would not deliver the purse unless my husband arrived. And then this gentleman told Noya: 'Noya, please accompany this policeman and this lady to police headquarters.'

"When the policeman told me that he was going to take me to police headquarters, I asked him not to take me, to call my husband, that I was honest, that I had not stolen, but he refused. Then they took me down in the same elevator, and then we reached the door in the corner, and as we did so I became unconscious of what was happening. I could only hear the policeman saying 'Back! . . . . Back! . . . .' and nothing else."

■ We have only to consider the third assignment of error which refers to the amount of damages.

Referring to the damages, the trial judge said:

"Before the happening Mrs. Casanova was a woman enjoying good health. After the same her organism suffered a serious, intense and total alteration. Intense fevers, frequent and excessive vomits, intense pain in the head, the chest and the stomach; desire and unability to cry; sensations of change in temperature, disorders, which still exist, in her periodic menstruation; extreme nervous excitement; mental obsession with the everlasting remembrance of the scandal which caused her to think of suicide to avoid being a living cause of the dishonor to her husband and her children, to the extent that by reason of her mania for suicide she was considered a danger to her children and husband; subjection to medical treatment; confinement in bed; moving to different places, some of them isolated from all social connections; horror to confront her friends; voluntary isolation for fear that the imputation be believed to be true; spiritual anguish, moral pain, shame; signs that may occur and which occurred in this case, as the result of a strong emotional

shock or intense moral pain causing a dangerous commotion, with anguish of spirit, of the animic structure of any person.

"Which of those damages were caused by the slander? Which by the false arrest? It is very difficult to make a distinction due to the special nature of the case. Both causes of action are so intimately related to each other that although essentially and from a legal standpoint they must have a separate existence, by their scope they may be regarded as one. Passing upon the facts, as a whole, however, any distinction which would give more importance to the damages caused by any of both causes of action, would be arbitrary. The court believing thus, is of the opinion that plaintiff's wife has suffered, as a whole, damages which must be paid by defendant and which the court reasonably fixes, in view of all the attending circumstances of the case, in the sum of $10,000 distributed as follows: $5,000 for the first cause of action and $5,000 for the second, which includes the sum claimed for expenses incurred, adjudging also that defendant must pay the costs, expenses and attorney's fees of plaintiff incurred in this case."

Both parties cite numerous cases. Appellant maintains that the amount fixed is excessive and appellee that it could have been larger still.

It is difficult to determine the exact amount which should be allowed in cases in this nature. Weighing all the attending circumstances, we believe that the judgment must be modified so as to fix the compensation at $5,000. And as modified the judgment is affirmed.